UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

GLOVER CONSTRUCTION CO., INC.

    *Plaintiff*,

                                   NO. 3:21-cv-692-BJD-PDB

v.

CDM SMITH, INC., and

THE CHEMOURS COMPANY FC, LLC,

*Defendants*.

---

## **THIRD AMENDED COMPLAINT**

    Plaintiff, GLOVER CONSTRUCTION CO., INC., by its undersigned attorneys sues Defendants, CDM SMITH, INC. and THE CHEMOURS COMPANY FC, LLC, as follows:

### **The Parties**

    1. GLOVER CONSTRUCTION CO., INC. d/b/a GLOVER CONSTRUCTION COMPANY OF NORTH CAROLINA ("Plaintiff" or "Glover") is a North Carolina corporation with its principal place of business located in Pleasant Hill, North Carolina.

    2. Defendant, CDM SMITH Inc. ("Defendant" or "CDM") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts, maintaining offices and doing business in Jacksonville, Duval County, Florida.

1

3. Defendant, THE CHEMOURS COMPANY FC, LLC ("Chemours"), the successor by merger to The Chemours Company TT, LLC, is a Delaware Limited Liability Company with its principal place of business in Wilmington, Delaware.

## The Trail Ridge Landfill Expansion Project

4. THE CITY OF JACKSONVILLE ("City" or "COJ") (not a party hereto) is a municipal corporation located in Duval County, Florida.

5. At all times material hereto, COJ was the owner of the Trail Ridge Landfill located at 5110 U.S. Highway 301 South, Duval County, Florida.

6. At all times material hereto, CDM was registered and authorized to provide professional engineering services in the state of Florida, FL COA No. EB-0000020.

7. At a date unknown to Glover, COJ contracted with CDM to provide design and other professional engineering services required to expand the Trail Ridge Landfill by construction of Phases 6-8, Class 1 Cell Expansion (the "Project").

8. At all times material hereto, ENGLAND-THIMS & MILLER, INC. ("ETM") (not a party hereto), was registered and authorized to provide professional engineering services in the state of Florida, FL COA No. 2584.

9. At a date unknown to Glover, COJ contracted with ETM to provide professional engineering services for use in permitting the Project.

10. In February 2013, CDM issued a Regional Surface Water Model Final Report to COJ for use in permitting the Project.

11. In February 2013, ETM issued Trail Ridge Landfill Phase 6-8 Drainage Calculations to COJ for use in permitting the Project. This report stated: "[m]uch

of the existing site drainage is affected by the trail road swales and other existing swale systems existing on site generally flowing from west to east."

12. In April 2013, based on "Hydrologic and Hydraulic Modeling" performed by CDM, ETM prepared design drawings, including design of a Stormwater Management System[1], for use in permitting the Project (the "Permit Plans"). The Permit Plans were only 30% complete and not for use in construction of the Project.

13. CDM's "Hydrologic and Hydraulic Modeling" relied upon by ETM in preparing the Permit Plans identified groundwater elevations across the site and peak overland water flow onto and across the Project site, which were used to determine the size of the Stormwater Management System.  In its Hydrogeological Report, Appendix P2, CDM assumed that the ditch paving would lower the groundwater elevation up to five (5) feet but provided no data or analysis to support that assumption.

14. The CDM Regional Surface Water Model Final Report, and the Drainage Calculations and Permit Plans prepared by ETM (collectively, the "Permit Documents") were provided to the Florida Department of Environmental Protection ("FDEP") to obtain a permit authorizing construction of the Project.

---

[1] The Stormwater Management System design provided in the Permit Plans included Wetlands Inlet Flumes, an Interceptor Ditch, a Perimeter Ditch and Interior Diversion Ditches (collectively the "Stormwater Management System") which were intended to be interdependent and function together to manage the flow of stormwater onto, across and off the Project site.

15. The Permit Plans at Sheet 12 specified the construction of inlet flumes at wetlands on the west boundary of the Project (the "Wetlands Inlet Flumes"). The Permit Plans showed the Wetlands Inlet Flumes sloping from the existing grade at the western Project boundary to the bottom of the Interceptor Ditch in order to control the flow of stormwater from adjacent property west of the Project site into the Interceptor Ditch. The design intent was to protect the Interceptor Ditch from overland stormwater flow and to facilitate the natural drainage patterns of offsite water across the Project. The Permit Plans called for the Wetlands Inlet Flumes to be reinforced with a "Fabriform" material to prevent the energy of offsite water flow from undermining the Interceptor Ditch.

16. The Permit Plans called for the concrete ditch panels to be constructed in accordance with COJ Standard Design which required a 4" thick slab and included options for 5' weep spacing and an underdrain system at the direction of the Engineer.

17. In December 2013, the FDEP issued Permit No. 16-307659-002-EI (the "Permit") authorizing construction of the Project in accordance with the terms, conditions and attachments contained in the Permit and Permit Documents including, *inter alia*, the Permit Plans.

18. After the Permit was issued, CDM prepared final construction drawings for use in soliciting bids and construction of the Project (the "Construction Drawings").

19.  In preparing the Construction Drawings, CDM relied upon its Hydrologic and Hydraulic Modeling which CDM failed to update to identify the increased stormwater flow onto the Project site that it should have expected to occur because of the adjacent landowner's, Chemours', ongoing mining operations and timber activities adjacent to the wetlands at Ditches "C," "F," "G," and Fiftone Road.

20.  The Construction Drawings revised the design of the Wetlands Inlet Flumes intended to protect the Interceptor Ditch from that shown in the Permit Plans. A less robust permeable plastic fiber mat was substituted for the originally specified non-permeable "Fabriform." The slope of the Wetlands Inlet Flume was revised to terminate below the top edge of the Interceptor Ditch, rather than at the bottom of the ditch. The revised design allowed offsite stormwater to permeate through the fiber mat and flow under the top edge of the concrete ditch panel, contributing to localized higher groundwater levels and undermining of the Interceptor Ditch.

21.  The Construction Drawings also substituted the FDOT Standard Index 281 design for the concrete ditch panels in lieu of the COJ Standard ditch panel design included in the Permit Plans.  The FDOT Standard 281 ditch panel design required only a 3" thick slab, weeps every 10' and no underdrain system which reduced the ditch panel capacity to relieve hydrostatic pressure due to elevated groundwater levels.  CDM never evaluated the FDOT Standard Index 281 design for application to the Project site or to achieve the presumed draw down (lowering) of the groundwater table up to 5 feet.  There is no evidence that CDM evaluated its ditch panel design for fitness for use or buoyancy.

22. COJ issued BID No. CP-007-15, including, *inter alia*, an Invitation to Bid, Instructions to Bidders, a contract form, General Conditions, Specifications and the Construction Drawings, to solicit competitive bids from qualified contractors for construction of the Project (the "Solicitation").

23. Glover responded to the Solicitation and was the successful low bidder. In May 2015, COJ awarded a contract to Glover for construction of the Project in accordance with the Construction Drawings prepared by CDM (the "Construction Contract").

24. CDM knew, or should have known, that Glover would use and rely on its Construction Drawings in the construction of the Project.

25. COJ amended its contract with CDM by change orders which required that CDM provide professional services for contract administration and supervision of Glover's construction of the Project.

## Glover's Damaged Work

26. On September 10-11, 2016 Hurricane Hermine, a 10-year storm, impacted the Project site and surrounding lands causing elevated groundwater levels, hydrostatic pressure and buoyant forces acting on the underside of the ditch panels. Groundwater and offsite stormwater known to historically flow from the west across the Project site undermined the West Interceptor Ditch. The elevated hydrostatic pressure and buoyant forces caused the ditch panels to crack and lift upward. Soils eroded from underneath the ditch panels through cracks in the slab as the hydrostatic pressure was relieved and groundwater flowed into the ditch

6

carrying the soil with it.  The soil erosion under and behind the ditch panels telegraphed laterally and upward, extending to the top edge of the ditch. Stormwater flowed across the interior of the Project site washing out Glover's work in progress at the North Interceptor Ditch adjacent to the box culvert (station 172) where no concrete panels had yet been installed.  There was nothing Glover could have done to protect its completed work from damage caused by the high groundwater levels, hydrostatic pressure and offsite stormwater.

27. At the time Hurricane Hermine impacted the Project, Glover had substantially completed work on the Interceptor Ditch (except at the Wetlands Inflow Flumes F & G and the box culvert at station 172), thus, it should have functioned as intended.

28. In October 2016, Hurricane Matthew impacted the Project site and surrounding lands causing additional damage to Glover's work, similar to the damage which resulted from Hurricane Hermine.

29. Prior to Hurricanes Hermine and Matthew, Glover spent five (5) days to prepare the site for the approaching storms which included, *inter alia*, the construction of three berms ("Winrows"), matting the slopes of the ditch, and digging a new ditch.

30. The Project site and surrounding lands were impacted by Hurricane Irma in September 2017 causing elevated groundwater levels.  Groundwater and offsite stormwater from adjacent property west of the Project site flowed onto and across the Project site and undermined the Wetlands Inlet Flumes and the Interceptor

Ditch.  Hydrostatic pressure caused the ditch panels to crack, buckle and heave. Soils eroded from under the ditch panels through cracks in the slab as the hydrostatic pressure was relieved and groundwater flowed into the ditch carrying the soil with it.  The soil erosion under and behind the ditch panels telegraphed laterally and upward, extending to the top edge of the ditch.  Again, there was nothing Glover could have done to protect its completed work from damage caused by high groundwater levels, hydrostatic pressure and offsite stormwater.

31. In advance of Hurricane Irma, Glover spent four (4) days, September 6-9 2017, to prepare and protect the site and completed work from the approaching storm by, *inter alia*, building additional Winrows to protect the work from the stormwater flow. Unfortunately, these efforts proved unsuccessful as Hurricane Irma caused significant damage to the completed work at the Project similar to that experienced during Hurricanes Hermine and Matthew.  There was nothing Glover could do to protect the concrete ditch panels from hydrostatic pressure caused by high groundwater levels.

32.  In June 2018 the Inflow Flume from the Interceptor Ditch into Pond B collapsed.  Contemporaneous investigation by CDM documented that the weeps in the Inflow Flume were clogged ("blinded") by fine soils.  The resulting buildup of hydrostatic pressure cracked the slab and groundwater flowed up through the cracks in the slab carrying the soils from under the slab with it.  As the soils eroded from underneath, the concrete ditch panels collapsed.

## CDM Revised Its Design to Control Stormwater and Prevent Future Drainage

33.  Subsequent to Hurricane Irma, CDM revised the design of the Wetlands Inlet Flumes, Interceptor Ditch and the Pond B Inflow Flume in order to withstand and control groundwater and the flow of stormwater onto and across the Project site. These design changes included, but were not limited to, *inter alia:*

(a) The Wetlands Inlet Flumes between the Interceptor Ditch and the west Project boundary were constructed of concrete, rather than permeable plastic fiber mat;

(b) The perimeter edges of the new concrete Wetlands Inlet Flumes were armored with rip rap to prevent undermining of the Wetlands Inlet Flumes and Interceptor Ditch;

(c) The discharge elevation of the Wetlands Inlet Flumes were extended lower, closer to the bottom of the Interceptor Ditch rather than terminating under the top edge of the Interceptor Ditch;

(d) The Inflow Flume at Pond B was redesigned to require 5" thick concrete ditch panels, additional reinforcement, an underdrain system with weep holes every 5' instead of 10', and a 12" thick layer of #57 stone with filter fabric.

(e) A drop inlet was added to address offsite overland stormwater flow into the Interceptor Ditch from the west at Fiftone Road between stations 157 and

158, a source of concentrated stormwater flow which undermined the West Interceptor Ditch during Hurricane Irma;

34. CDM changed the design of the Wetlands Inlet Flumes because the fiber mat required by its Construction Drawings was not adequate to protect the Inlet Flumes and Interceptor Ditch from offsite stormwater and the effects of increased groundwater.  Likewise, specified stabilization measures such as "grassing" and "vegetation" were not adequate to protect the Wetlands Inlet Flumes and Interceptor Ditch from the offsite stormwater, or the erosion of soils from beneath the ditch panels.

## Count I – Professional Negligence (CDM)

35. This is an action for professional negligence against CDM SMITH INC. with damages in excess of $75,000 exclusive of prejudgment interest and costs.

36. Plaintiff realleges paragraphs 1-34, above.

37. CDM owed Glover a duty to design the Stormwater Management System and provide professional engineering services for the Project in compliance with the applicable engineering standard of care as required to control groundwater, the overland stormwater flow onto and across the Project site, and prevent damage to Glover's Work.

38. CDM breached its duty to Glover in that the professional engineering and design services provided by CDM for the Project included the following errors and omissions and did not meet the engineering standard of care:

(a) In preparation of the Construction Drawings, CDM did not update its Hydrologic and Hydraulic Modeling to reflect the impact of the adjacent landowner's ongoing mining operations and timber activities adjacent to the wetlands at Ditches "C," "F," "G," and Fiftone Road which had the effect of increasing groundwater levels and the offsite stormwater flow onto the Project site;

(b) Error to change the permitted Wetlands Inlet Flume design which required use of non-permeable "Fabriform" material for construction of the inlet flumes and termination of the flumes at the bottom of the Interceptor Ditch to a less robust design utilizing a permeable fibermat in lieu of "Fabriform" and terminating the flumes below the top edge of the Interceptor Ditch. The permitted design would have functioned properly and prevented the damage that occurred in the area of the Wetlands Inlet Flumes due to CDM's changes to the Permit design in the Construction Documents;

(c) Omission to design the Wetlands Inlet Flumes in such a way that they could not handle the energy of concentrated stormwater flow, leading to localized increased groundwater levels and undermining of the fibermat and Interceptor Ditch;

(d) Error to design permeable fibermat Wetlands Inlet Flumes below the top edge of the Interceptor Ditch, creating a dam and diverting stormwater flow under the concrete ditch panels. This increased hydrostatic pressure under

the Interceptor Ditch which lifted up, displaced and broke the concrete ditch panels, requiring that the panels be replaced;

(e) Error to use the FDOT Design Standard Index 281 (2014) for the concrete ditch panel design without modification to meet the Project site conditions, in lieu of the COJ Standard design specified in the Permit Plans. CDM had a duty to determine the fitness for use and limitations of the FDOT 281 Standard Index design for application to the Project site, which it did not do.

(f) Error and omission to design the concrete ditch panels by adopting the FDOT Standard Index 281 design without modification required to satisfy the groundwater levels and hydrostatic pressure CDM knew and expected (or should have known) would exist at the Project site. CDM did not evaluate the FDOT Standard Index 281 design for buoyancy, fitness for use at the Project site, or whether the selected design would achieve the presumed draw down (lowering) of the groundwater table up to 5 feet.

(g) Error to design the concrete ditch panels at the Pond B Flume in a manner that did not resist hydrostatic pressure of the surrounding soil. The concrete ditch panels were not sufficient to resist the hydrostatic pressure and cracked requiring replacement;

(h) Error in the design sequencing, i.e., failure to coordinate the construction of Interior Diversion Ditches, the Perimeter Ditch and other stormwater diversion structures with the construction of the Interceptor Ditches. The Interceptor Ditch was not designed to control stormwater flow from the

interior of the site.    Uncontrolled stormwater flowed from the West Interceptor Ditch across the interior of the Project site washing out incomplete portions of the North Interceptor Ditch adjacent to the box culvert (station 172) where no ditch panels had yet been installed;

(i) Omission by failure to provide for control of overland stormwater flow down Fiftone Road between stations 157 and 158, a source of concentrated flow which undermined the Interceptor Ditch during Hurricane Irma. CDM should have recognized the impact the adjacent landowner's mining operations and timber activities had on the overland stormwater flow and its design should have provided for control of the concentrated offsite stormwater to prevent damage to the Interceptor Ditch;

(j) Error in failing to act on patent design defects once the defects were brought to CDM's attention. Glover and its subcontractor identified problems with groundwater and controlling overland stormwater flow, but CDM did nothing to respond to those concerns until it redesigned the Wetlands Inlet Flumes (including at Fiftone Road) and Pond B Inflow Flume after Hurricane Irma. CDM's failure to timely respond exposed constructed ditch panels to hydrostatic pressure that the panels were not designed to accommodate, and uncontrolled overland stormwater flow which damaged Glover's completed work which had to be replaced.

39. As a result of the foregoing errors and omissions, CDM's Project design, as depicted in the Construction Drawings, was not adequate to protect Glover's work

from the anticipated groundwater, hydrostatic pressure and offsite overland stormwater flow and did not facilitate the natural drainage pattern of offsite water across the Project.

40. Glover suffered substantial damage as a result of the design errors and omissions in CDM's Construction Drawings. The groundwater, hydrostatic pressure and uncontrolled offsite stormwater undermined and damaged Glover's completed work. Glover incurred substantial additional costs to repair and replace its damaged Work, and completion of the Project was significantly delayed resulting in additional unanticipated overhead expense.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., demands judgment for damages against Defendant, CDM SMITH INC. together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

### Count II – Nuisance (Chemours)

41. This is an action for nuisance against Defendant, The Chemours Company, FC, LLC with damages in excess of $75,000 exclusive of prejudgment interest and costs.

42. Plaintiff realleges paragraphs 1-12, 14, 17, 22, 23 and 30 above.

43. The Construction Contract incorporated "Specifications and Contract Documents for the Trail Ridge Landfill Construction, Phase 6, Class I Cell Expansion" (the "Contract Documents"). The Contract Documents obligated COJ to provide Glover the lands on which the work was to be done. (See General

Conditions at ¶20.22.1).  In addition, the Contract Documents charged Glover with the responsibility to protect the Project Site and allocated financial risk to Glover for damage to its work.  (See General Conditions at ¶20.32.1.1, 20.32.3, 20.32.4, 20.32.5).

44. At all times material hereto, Chemours owned the upland property directly adjacent to and west of the Project site on which it has conducted mining operations and timber activities (the "Chemours Property").

45. The mining operations conducted on the Chemours Property were authorized by an Environmental Resource Permit (the "ERP") issued by the FDEP in 2009.  The ERP was transferred to Chemours.  At all times material hereto, Chemours has been and is responsible for complying with all conditions and requirements of the ERP as the "Permittee."

46. The natural flow of surface water from the Chemours Property was east and north into wetlands and then onto the Project site at, *inter alia*, Ditches C, F and G.

47. In furtherance of its mining operations on its property adjacent to the Project Site, Chemours constructed and/or maintained a stormwater management system including stormwater treatment polishing and discharge ponds in which Chemours accumulated and stored large quantities of water.

48. Chemours' mining operations and timber activities increased groundwater levels and the surface water flow across the Chemours Property onto the Project site.

49. Chemours' mining operations and timber activities adjacent to the Wetlands at Ditches C, F and G, and Fiftone Road, including the removal of culverts, changed the natural flow of surface water on the Chemours Property from the wetland areas to Fiftone Road and onto the Project site.

50. Chemours knew and understood the impact the mining operations and timber activities had on the stormwater flow across its property and in or about November 2015 Chemours attempted to redirect surface water flow to prevent gullying on Fiftone Road.

51. In September of 2017, contemporaneous with Hurricane Irma, "…Chemours discharged approximately 1.25 million gallons of treated water on each of September 11 and 12 from its industrial wastewater pond …," which flowed east and north across the Chemours Property and onto the Project site causing significant damage to the Interceptor Ditch and other work performed by Glover.

52. Chemours' use of its property and operation of the storm management system and stormwater treatment ponds on its property, was unreasonable where it changed the historical natural flow of water from the wetlands areas to Fiftone Road and resulted in the discharge of a large quantity of water which flowed onto the Project site causing extensive damage to the Interceptor Ditch and other work performed by Glover.

53. Glover has been damaged by Chemours' unreasonable conduct in the use of its property and operation of the stormwater management system and stormwater treatment ponds including, *inter alia*, the cost to repair and reconstruct its

damaged work, labor inefficiencies, delays, extended and unanticipated overhead and general conditions costs.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., demands judgment for damages against Defendant, THE CHEMOURS COMPANY, FC, LLC, together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

### Count III – Negligence (Chemours)

54. This is a negligence action against Defendant, The Chemours Company FC, LLC with damages in excess of $75,000 exclusive of pre-judgement interest and costs.

55.  Plaintiff realleges paragraphs 1-12, 14, 17, 22, 23, 30 and 43-53, above.

56.  Chemours owed Glover a duty to protect it from damage it could or should have foreseen to be the result of its timber activities and mining operations including the use and operation of the stormwater management system and stormwater treatment ponds on its property.

57. Chemours breached its duty to Glover by its failure to maintain the natural flow of surface water through the wetlands onto the Project site and the release of large quantities of water from its stormwater treatment ponds during Hurricane Irma.

58. Chemours knew or should have known that its failure to maintain the natural flow of surface water into the wetlands, and the discharge of large quantities of water from its stormwater treatment ponds, would channel the

17

discharged water and surface water flow down Fiftone Road onto the Project site resulting in damage to Glover's work and the Project site.

59. Glover was damaged as a direct and proximate result of Chemours' breach of duty in the failure to maintain the natural flow of surface water into the wetlands, and the unreasonable use and operation of its stormwater management system and stormwater treatment ponds on its upland property adjacent to the Project site.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., demands judgment for damages against Defendant, THE CHEMOURS COMPANY, FC, LLC, together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

### Count IV – Nuisance (Chemours by Assignment from COJ)

60. This is an action for nuisance against Defendant, The Chemours Company, FC, LLC by Plaintiff as the assignee of the City of Jacksonville with damages in excess of $75,000, exclusive of prejudgment interest and cost.

61. Plaintiff realleges paragraphs 1-12, 14, 17, 22, 23, 30, 44-52, above.

62. As a result of the changes Chemours made on its Property through its mining operations, timber activities and otherwise, Chemours materially altered the volume and manner in which water left its Property and entered COJ's Property.

63. In September, 2017, because of the changes Chemours had made to its

Property, large quantities of water were channeled and/or discharged towards COJ's Property from Chemours' Property.

64.  The discharged and/or channeled water flowed east and north across the Chemours Property and onto the Landfill Site causing significant damage to COJ's Property and improvements constructed thereon.  As a result of the foregoing, COJ suffered damages in the form of additional design and construction services to address the water flowing from Chemours' Property to the Landfill site.

65.  Chemours' use of and operations on its Property were unreasonable and resulted in the discharge and/or channeling of large quantities of water onto COJ's Landfill site.

66.  COJ has been damaged by Chemours' unreasonable use of and operations on its Property.

67.  By written agreement COJ has assigned to Glover all of its right, title and interest in any and all claims and/or right to damages against Chemours arising out of or relating to Chemours' operations on and use of its Property, as alleged herein.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., as assignee of THE CITY OF JACKSONVILLE, demands judgment for damages against Defendant, THE CHEMOURS COMPANY, FC, LLC, together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

## Count V – Trespass (Chemours by Assignment from COJ)

68.  This is an action for trespass against Defendant, The Chemours Company, FC, LLC by Plaintiff as the assignee of the City of Jacksonville with damages in excess of $75,000, exclusive of prejudgment interest and cost.

69.  Plaintiff realleges paragraphs 1-12, 14, 17, 22, 23, 30, 44-52 and 62-67, above.

70.  In September 2017, Chemours, without consent and against the will of COJ, trespassed on COJ's Property when it caused or allowed large quantities of water to be discharged and/or channeled from Chemours' Property onto COJ's Landfill site.

71.  By reason of Chemours' acts, COJ has suffered significant damage to its Property and improvements constructed thereon.

WHEREFORE, Plaintiff, GLOVER CONSTRUCTION CO., INC., as assignee of THE CITY OF JACKSONVILLE, demands judgment for damages against Defendant, THE CHEMOURS COMPANY, FC, LLC, together with an award of prejudgment interest, costs and such other and further relief as the Court may deem meet and proper.

Dated this ___6^TH___ day of April 2023.

AG ADAMS LAW, P.A.

_____

Adam G. Adams, III
Florida Bar No. 370738
1522 Oak Street
Jacksonville, FL 32204
Telephone (904) 256-4112
service@agadamslaw.com
lep@agadamslaw.com
jessica@agadamslaw.com
annie@agadamslaw.com
Attorneys for Plaintiff *GLOVER CONSTRUCTION CO., INC.*
and

Woods Rogers Vandeventer Black PLC
Anthony J. Mazzeo
Florida Bar No. 0114650
101 W. Main St.
500 World Trade Center
Norfolk, VA 23510
tony.mazzeo@wrvblaw.com
Attorneys for Plaintiff Glover Construction Co., Inc. d/b/a Glover Construction Company of North Carolina

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on ___6^TH___ April 2023, I electronically filed the foregoing with the Clerk of Court by using the ECF system which will send a notice of electronic filing to the following:

Edward Cole, Esq.
COWARD HICKS & SILER, P.A.
211 Cashiers School Rd.

P.O. Box 1918
Cashiers, NC 28717
ecole@cashierslaw.com
*Attorney for Defendant, The Chemours*
*Company FC, LLC*

Thomas O. Ingram, Esq.
SODL & INGRAM, PLLC
233 East Bay Street, Suite 1113
Jacksonville, Florida 32202
Thomas.ingram@si-law.com
*Attorney for Defendant, The Chemours*
*Company FC, LLC*

W. Braxton Gillam, IV, Esq.
Patrick W. Joyce, Esq.
MILAM HOWARD NICANDRI
& GILLAM, P.A.
14 East Bay Street
Jacksonville, Florida 32202
Primary: bgillam@milamhoward.com
Secondary: sphipps@milamhoward.com
Primary: pjoyce@milamhoward.com
Secondary:
hdurham@milamhoward.com
*Attorneys for Defendant, The City of*
*Jacksonville*

Christopher M. Garrett
Chief, General Litigation
Tiffiny Douglas Pinkstaff
Assistant General Counsel
OFFICE OF GENERAL COUNSEL
CITY OF JACKSONVILLE
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Primary: garrettc@coj.net
Secondary: aseegobin@coj.net
Primary: tpinkstaff@coj.net
Secondary: jmurad@coj.net

Brian W. Bennett, Esq.
Michael A. Flegiel, Esq.
BENNETT LEGAL GROUP, P.A.

214 South Lucerne Circle East, Suite 201
Orlando, FL  32801
brian@bennettlegalgroup.com
mike@bennettlegalgroup.com
bonnie@bennettlegalgroup.com
jordan@bennettlegalgroup.com
*Attorneys for Defendant, CDM Smith Inc.*

_____
Attorney